**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TERRIE LYNN SMITH-WILLIAMS,**

     **Plaintiff,**

**v.**                                                    **Case No.: 2:16-cv-03556**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,[1]**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 12, 13).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On July 30, 2013 and May 28, 2014, respectively, Plaintiff Terrie Lynn Smith-Williams ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 1, 1994,[2] (Tr. at 215, 218), due to "Riters [*sic*] syndrome, chronic pain, Autoimmune Disorders, Uveitis, Vision Problems, Balance Problems, Numbness in face, Diverticulosis, Anxiety, Depression, Attention Deficit Disorder ("ADD"), Fibromyalgia, Arthritis [and] Endometriosis." (Tr. at 256). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 104, 110). Claimant filed a request for an administrative hearing, which was held on April 1, 2015 before the Honorable Scott Johnson, Administrative Law Judge ("ALJ"). (Tr. at 34-81). By written decision dated April 14, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 15-28). The ALJ's decision became the final decision of the Commissioner on December 28, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 5-7).

Claimant timely filed the present civil action seeking judicial review pursuant to

---

[2] Claimant subsequently amended her alleged onset date to February 23, 2008. (Tr. at 15).

42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 12). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a Reply. (ECF No. 14).  Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 50 years old at the time of the alleged onset of disability and 57 years old at the time of the ALJ's decision. (Tr. at 15, 38). She has at least a high school education and communicates in English. (Tr. at 43, 255). Claimant previously worked as a caregiver, daycare provider, medical assistant, and bank teller. (Tr. at 44-49, 258).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a

determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the

ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through June 30, 2010. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since February 22, 2008. (Tr. at 17, Finding No. 2).  At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "diverticulosis, gastroparesis, fibromyalgia syndrome affecting the hands, wrists, knees, and ankles, cervical spondylosis, and asthma." (Tr. at 17-18, Finding No. 3). The ALJ considered and found non-severe Claimant's carpal tunnel syndrome, right rotator cuff tear, Reiter's syndrome, uveitis, degenerative disc disease of the spine, endometriosis, anxiety, depression, and ADD. (Tr. at 18-20, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-21 Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with lifting/carrying of 50 pounds occasionally and 25 pounds frequently; sitting for six hours; standing/walking six hours; and pushing/pulling within the lifting/carrying restrictions of medium exertion. She can frequently perform reaching in all directions (including overhead), handling, and fingering with the bilateral upper extremities. She can frequently

perform climbing of ramps and stairs but only occasionally perform climbing of ladders, ropes, or scaffolds. She can frequently perform balancing, stooping, kneeling, and crouching. She can occasionally perform crawling. She should avoid concentrated exposure to hazards such as unprotected heights and moving mechanical parts, dust, odors, fumes, gases, pulmonary irritants, chemicals, poorly ventilated areas, extreme cold, extreme heat, and excessive vibration.

(Tr. at 21-26, Finding No. 5). At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant was able to perform past relevant work as a childcare provider and medical assistant. (Tr. at 26-27, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 27, Finding No. 7).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision, which both concern the ALJ's RFC finding. First, Claimant contends that the ALJ failed to include any limitations in Claimant's RFC to account for her digestive issues and fibromyalgia, nor did he adequately explain his decision to not include further limitations, thereby frustrating meaningful review. (ECF No. 12 at 8-10). Second, Claimant argues that the ALJ failed to consider her non-severe impairments in making his RFC finding. (*Id.* at 10).

In response to Claimant's assertions of error, the Commissioner argues that the ALJ considered the combined, synergistic effect of Claimant's impairments, both severe and non-severe, in assessing Claimant's RFC. (ECF No. 13 at 16-20).

## V.    Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized as follows.

## A. Treatment Records

Prior to Claimant's alleged onset of disability, she saw rheumatologist, Thomas W. Howard, M.D., who noted in October 1991 that Claimant had swelling and pain in her right foot. (Tr. at 350). Dr. Howard attributed these symptoms to possible incomplete Reiter's Syndrome, a form of reactive arthritis. Dr. Howard also noted that Claimant had a problem for many years that was consistent with mild fibromyalgia syndrome. (*Id.*). A week later, Claimant presented to Dr. Howard and reported that her right foot "might be slightly improved." (Tr. at 345). She had some transient gastrointestinal distress from medication, which also improved; she noted that she had no chronic abdominal pain or chronic bowel problem of any type. (*Id.*).

Claimant continued to have tenderness associated with fibromyalgia during subsequent visits with Dr. Howard in 1996 and 1999. (Tr. at 342, 341). In November 2000, Claimant followed up with Dr. Howard and reported that her fibromyalgia was worsening. (Tr. at 340). She had widespread tender points, but no swelling, inflammation, or reduced range of motion in any joints. (*Id.*).

Claimant also presented with gastric complaints prior to her alleged onset of disability. In October 2006, she had an upper endoscopy with biopsy to evaluate gastroesophageal reflux disease ("GERD"), as well as a colonoscopy. (Tr. at 794, 797). It was noted that she had intermittent diarrhea and history of rectal bleeding. (Tr. at 797). Both examinations were "essentially normal." (Tr. at 794, 797). In February 2007, Claimant continued to complain of abdominal pain. (Tr. at 795). It was suspected that she might have gallstones, but testing was negative. (*Id.*).

After her alleged onset of disability, in May 2008, Claimant presented to Thomas Memorial Hospital with a headache and underwent a MRI of her cervical spine

to evaluate neck pain and fibromyalgia; the impression was minimal cervical spondylosis with no significant spinal stenosis. (Tr. at 401). For her headache, Claimant underwent a MRI of her brain, which was negative for abnormalities. (Tr. at 405).

In September 2008, Claimant presented as a new patient to Charles D. Frances, M.D., at University Eye Surgeons, complaining of chronic uveitis of her right eye. (Tr. at 363). By her next appointment in November 2008, the condition "felt much better." (Tr. at 361). In April 2009, Claimant had successful left eye cataract removal without complications. (Tr. at 367). Her uveitis remained stable, and she reported that she was doing well and was happy; she stated "it's a miracle." (Tr. at 357). The following year, in May 2010, Claimant reported that she thought her eyes were not working together; however, her uveitis was still stable. (Tr. at 355).

In October 2008, Claimant returned to Daniel Thistlethwaite, M.D., for follow-up regarding major depressive disorder with complaints of anxiety and depression. (Tr. at 369). She was noncompliant with her medication, having not started the prescribed Pristiq for about six months because she was fearful of side effects. (*Id.*). Her mental status examination was normal other than impaired short-term memory, inattention, and mildly impaired concentration. (Tr. at 369). The assessment was major depressive disorder and ADD. (*Id.*).

In December 2008, Claimant had a MRI of her right wrist to evaluate her complaints of pain with paresthesias radiating to her third digit. (Tr. at 534). The MRI was suggestive of mild edematous changes in the mediation nerve consistent with possible carpal tunnel syndrome, but no other periarticular osseous or soft tissue pathology was demonstrated. (*Id.*). Careful clinical and neurological correlation was

recommended to confirm the carpal tunnel findings. (Tr. at 534, 536). There were no radiographic abnormalities of her wrist and forearm region. (Tr. at 536).

In October 2009, Claimant had MRI scans of both shoulders following a "lifting injury" on June 13, 2009. (Tr. at 649-50). She stated that she heard a "pop" in her bilateral shoulders and suffered a burning sensation with pain and limited range of motion. (*Id.*). Her right shoulder MRI showed a partial bursal surface rotator cuff tear, specifically involving the distal aspects of the supra and infraspinatus tendons. (Tr. at 650). She also had a small amount of subacromial fluid and a small subchondral cyst in the humeral head in her right shoulder. (*Id.*). The MRI of her left shoulder showed no evidence of fracture, joint effusion, or tendon tear, but she had minimal nonspecific fluid in the subacromial/subdeltoid bursa. (Tr. at 649).

In April 2010, Claimant returned Dr. Thistlethwaite, after last being seen in October 2008. (Tr. at 371). She complained of moderate-to-severe depression and anxiety that was present for the past two months. (*Id.*). Her mental status examination revealed no abnormal results. (Tr. at 372). Her psychiatric examination was also normal other than depressed mood and congruent affect. (*Id.*). The assessment was "bipolar I disorder, depressed, without mention of psychotic behavior." (*Id.*). She was treated with medication. (*Id.*).

Claimant returned to Dr. Thistlethwaite two months later and continued to see him monthly through September 2010. In June 2010, Claimant reported that she still had anxiety and depression, which seemed to be worse than her prior visit. (Tr. at 374). However, her mental status and psychiatric examinations were normal, other than her anxious mood and restricted affect. (Tr. at 375). The assessment was ADD and recurrent major depressive disorder without mention of psychotic behavior. (*Id.*). The

following month, Claimant reported that her anxiety and depression remained the same. (Tr. at 376). Her mental status and psychiatric examinations were still normal except for a restricted affect. (Tr. at 377). The assessment was ADD, major depressive disorder, and generalized anxiety disorder. (*Id.*). In August 2010, Claimant said that her symptoms remained unchanged, including anxiety, depressed mood, fatigue, low energy, and worry. (Tr. at 378). Her mental status examination and psychiatric examinations were normal other than an anxious mood and corresponding affect. (Tr. at 379). Finally, on September 23, 2010, Claimant's mental status and psychiatric examinations were still essentially normal; although her mood was neutral mood and her affect was restricted. (Tr. at 381).

In June 2011, Claimant had a regularly scheduled gynecological visit. Her endometrium appeared normal. (Tr. at 439). Several months later, she presented to Thomas Memorial Hospital with a facial abscess. She denied nausea, abdominal pain, vomiting, or diarrhea. (Tr. at 581).

In March 2012, Claimant saw neurologist Glenn Goldfarb, M.D., who opined that Claimant most likely had fibromyalgia. (Tr. at 412). Her examination was normal except for slight right ptosis. (*Id.*).

Over the next two years, Claimant had various gastrointestinal testing. In October 2013, Claimant underwent an esophagogastroduodenoscopy ("EGD") with endoscopic ultrasound study by Jeremy Ryan Stapelton, D.O.; the results were unremarkable. (Tr. at 523). In January 2014, Claimant had further testing, which showed delayed gastric emptying. (Tr. at 557). Less than a week later, Claimant complained to Dr. Stapleton of gastric issues. (Tr. at 558). However, on examination, the shape of her abdomen, bowel sounds, and abdominal percussion were all normal.

(Tr. at 561). Her abdomen was soft to palpation without tenderness or mass. (*Id.*). Her liver and spleen were not enlarged, and no hernia was discovered. (*Id.*). Dr. Stapleton assessed Claimant with GERD, gastroparesis, constipation, abdominal pain in the right upper quadrant, abdominal bloating, diarrhea, and nausea. (*Id.*). She was prescribed Reglan, scheduled for a follow-up appointment in two months, advised to return to the clinic if her condition worsened or new symptoms arose, and told to maintain a healthy, low-residue diet. (Tr. at 562). Later that year, Claimant had a diagnostic colonoscopy by Dr. Stapleton, which revealed internal hemorrhoids and mild diverticulosis of her sigmoid colon. (Tr. at 582). She also had another EGD, which revealed a polyp in her stomach and Schatziki's ring. (Tr. at 583).

Finally, in September 2014, Claimant reported that her fibromyalgia was not well controlled, but she was frightened to take any medication due to possible side effects. (Tr. at 673).

### B. Opinion Evidence

State agency consultant, Debra Lilly, Ph.D., completed a Psychiatric Review Technique form on October 14, 2013 based upon a review of Claimant's records. She found that Claimant had severe mental impairments, which she evaluated under sections 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) of the Listing. (Tr. at 87). She found "insufficient evidence" to evaluate the "paragraph B" or "C" criteria, to adjudicate the claim for the relevant DIB time period, or determine Claimant's credibility. (Tr. at 87-88).

Four days later, on October 18, 2013, Rabah Boukhemis, M.D., evaluated Claimant's physical RFC based upon his review of her records. He determined that Claimant could perform medium exertional level work with additional postural

limitations, including frequent climbing ramps/stairs, balancing, stooping, kneeling, and crouching and occasional climbing ladders/ropes/scaffolds and crawling. (Tr. at 89-90). Dr. Boukhemis assessed no manipulative limitations, visual, or communicative limitations. (Tr. at 90). He further opined that Claimant should avoid concentrated exposure to extreme cold and heat, vibration, fumes/odors/dusts/gases/poor ventilation, and hazards. (*Id.*).

In December 2013, Jeff Harlow, Ph.D., affirmed Dr. Lilly's findings, except he found that Claimant's mental impairments were non-severe. (Tr. at 96-98). Rogelio Lim, M.D., also affirmed Dr. Dr. Boukhemis's RFC findings. (Tr. at 98-100).

On February 23, 2015, Dr. Stapleton completed a "Digestive Questionnaire." He noted that he began treating Claimant in 2013 and saw her every three to six months. (Tr. at 767). He diagnosed Claimant with gastroparesis, chronic epigastric pain, nausea, diarrhea, and irritable bowel syndrome. (*Id.*). On a scale of "never, occasionally, frequently, and constantly," he opined that Claimant would need to occasionally take unscheduled breaks to go to the restroom. (Tr. at 768). He stated that Claimant was capable of working full-time without significant accommodations, except that she "may" need reduced work or one to two days off for flares of gastroparesis or IBS. (*Id.*).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support
> a particular conclusion. It consists of more than a mere scintilla of
> evidence but may be somewhat less than a preponderance. If there is
> evidence to justify a refusal to direct a verdict were the case before a jury,
> then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct

a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson*

*v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585,

589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ

followed applicable Regulations and Rulings in reaching his decision, and that the

decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial

evidence exists, the Court must affirm the Commissioner's decision "even should the

court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

### A.  Claimant's Digestive Impairments and Fibromyalgia

In her first challenge to the Commissioner's decision, Claimant asserts that the

ALJ failed to address what, if any, limitations Claimant would require to account for

her digestive problems, including the need to use the restroom frequently and chronic

nausea, and her fibromyalgia, which specifically affected her hands, wrist, knees, and

ankles. (ECF No.  12 at 9). Claimant contends that remand is warranted based on the

ALJ's failure to perform a function-by-function analysis, narratively explain how the

evidence supported each of his conclusions, or discuss why the RFC did not include

limitations to account for all of Claimant's severe impairments. (*Id.* at 9-10). In

support, Claimant cites *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and *Monroe v.*

*Colvin*, 826 F.3d 176 (4th Cir. 2016).

14

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR 404.1545(b-d) and 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that

would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, Claimant contends that the ALJ failed to perform the requisite function-by-function analysis. However, she does not cite, and the undersigned does not find, any relevant functions that the ALJ purportedly overlooked. *See* 20 CFR 404.1545(b-d) and 416.945(b-d) (stating the functions that the ALJ must assess). Claimant further argues that the ALJ failed to include limitations in her RFC, but does not state any limitations that were omitted. *See, e.g., Nock v. Comm'r, Soc. Sec. Admin.*, No. SAG-14-3986, 2015 WL 5781988, at *3 (D. Md. Sept. 30, 2015) ("Ms. Nock does not support that argument with any medical evidence or even any suggestion of the type of restrictions that, in her view, should have been included in the RFC assessment. Ultimately, there is no requirement that every severe impairment be addressed via a particular limitation in an RFC assessment."). Contrary to Claimant's

assertions of error, a review of the ALJ's decision reveals that the ALJ clearly articulated his analysis and findings regarding Claimant's fibromyalgia and gastric issues in determining her RFC. His decision demonstrates why any further restrictions were not warranted relating to those impairments.

Regarding fibromyalgia, the ALJ noted Claimant's complaints of arthritis/fibromyalgia in the joints in her right hand, knee, and foot. (Tr. at 22). He reviewed Claimant's statements that she was treated by Amy Casto and took Cymbalta, ibuprofen, and Prednisone during flare-ups. (*Id.*). He noted that Claimant did not have any physical therapy since 2008; she previously took muscle relaxers, but her body "reacts weird to medications and she had spasms;" and she reported difficulty opening a spaghetti jar and difficulty fingering during fibromyalgia exacerbation. (*Id.*). However, the ALJ noted other contradictory evidence. He pointed out that in October 2012, Claimant's gait and station were within normal limits without abnormalities; her bones, joints, and muscles were unremarkable; and her muscle strength and tone were normal. (Tr. at 23-24). Then, in December 2013, although Claimant complained of severe pain in her joints, her physical examination was normal and she was well appearing and in no distress. (Tr. at 24). The ALJ found that these normal findings were inconsistent with Claimant's allegations of disability and reflected negatively on her credibility. (*Id.*).

Likewise, the ALJ thoroughly discussed Claimant's gastric issues, including mild diverticulitis and gastroparesis (delayed gastric emptying). (Tr. at 23-24). The ALJ noted that in October 2013, Claimant's esophageal, gastric, and duodenal mucosa were normal, and she had normal parenchyma and pancreatic ductal system. (Tr. at 24). The ALJ further cited that in January 2014, although gastrointestinal testing

17

showed delayed gastric emptying, examination by her treating physician, Dr. Stapleton, was within normal limits and Claimant was merely advised to return if the condition worsened or new symptoms arose. (*Id.*). After discussing and considering Claimant's further records, the ALJ acknowledged Dr. Stapleton's opinion that Claimant could work on a full-time basis except that she would need to take unscheduled bathroom breaks on an occasional basis and may need reduced work or one to two days off during flare-ups of gastroparesis or irritable bowel syndrome. (Tr. at 26). However, the ALJ found that Dr. Stapleton's above opinions were not supported by the objective findings, which showed only mild symptoms. The ALJ emphasized that, furthermore, Claimant received no significant treatment; the record contained no clinical signs and findings of severe abdominal pain, weight loss, or associated symptoms; the physical examination of Claimant's abdomen in January 2014 was normal; Claimant's weight remained relatively stable; and, in February 2015, she reported only one to three bowel movements per day. (*Id.*). Therefore, the ALJ gave little weight to Dr. Stapleton's opinion. (*Id.*).[3]

Undoubtedly, the ALJ clearly articulated why restrictions for Claimant's fibromyalgia and digestive issues, beyond those provided in the RFC, were unwarranted. Moreover, the ALJ's findings were supported by substantial evidence. Claimant's earlier treatment records during the relevant period do not reflect any particular complaints or issues regarding her fibromyalgia or gastric issues. *See* (Tr. at 355, 357, 361, 363, 367, 369, 371, 374, 401, 405, 534, 536, 650, 662). Further, Claimant's subsequent records fail to indicate any significant issues regarding those

---

[3] Claimant does not challenge the ALJ's treatment of Dr. Stapleton's opinion.

conditions. In October 2011, she denied nausea, abdominal pain, vomiting, or diarrhea. (Tr. at 581). In March 2012, her physical examination was normal other than slight right ptosis. (Tr. at 412). In October 2013, her endoscopic ultrasound study by Dr. Stapleton was unremarkable. (Tr. at 523). In January 2014, while her gastrointestinal testing showed delayed gastric emptying, her physical examination was normal and she was merely prescribed Reglan, told to maintain a healthy diet, and to return in two months unless her condition worsened or she suffered new symptoms. (Tr. at 562). Overall, her treatment was conservative, and her records corroborated the ALJ's findings.

In addition, as noted by the ALJ, while Dr. Stapleton expressed some opinions in a "Digestive Questionnaire" that Claimant would need occasional unscheduled bathroom breaks during the day and *may* need reduced work or a day or two off work during flares of gastric issues, Dr. Stapleton's opinions were not supported by Claimant's treatment records. Dr. Stapleton agreed that Claimant could work on a full-time basis with occasional unscheduled bathroom breaks, and he was noncommittal as to whether Claimant would further require any days off for flare-ups of digestive symptoms.

In sum, Claimant fails to identify specific restrictions that should have been included in her RFC. Indeed, her argument only challenges the adequacy of the ALJ's discussion concerning his analysis of Claimant's fibromyalgia and digestive issues. (ECF No. 14 at 1-2) (stating that the ALJ only addressed the allegations and testimony and summarized the medical evidence without drawing any conclusions, that "[w]hat is missing from the ALJ's decision and what is at issue here is the ALJ['s] rationale for the ALJ's RFC finding," and contending that "[t]here is no function-by-function

analysis at all in his decision."). The undersigned disagrees with Claimant's contention. Contrary to Claimant's assertions, the ALJ complied with the law in evaluating Claimant's functional abilities, considering the objective medical evidence, opinion evidence, and Claimant's allegations. His decision clearly identifies his rationale with respect to her fibromyalgia and gastric issues, which was supported by substantial evidence in the record.

Notably, this is not a case, as in *Mascio* or its progeny, in which there remain unresolved conflicting opinions that might further limit Claimant's RFC. Rather, in this matter, two state agency physicians agreed that Claimant had the RFC to perform medium work with certain postural and environmental limitations. (Tr. at 89-90, 98-100). The ALJ not only gave great weight to those findings and incorporated them into Claimant's RFC, but he additionally limited Claimant to only frequent reaching in all directions, handling, and fingering with both extremities based upon his evaluation and analysis of the record. (Tr. at 21-26). To the extent Dr. Stapleton suggested the possibility of additional limitations, the ALJ resolved any conflicts and explained the basis for his determination.

While Claimant may disagree with the ALJ's RFC finding, "the determination of a claimant's RFC is ultimately the province of the ALJ as the representative of the Commissioner." *McPherson v. Astrue*, 605 F. Supp. 2d 744, 755 (S.D. W. Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2); *see also Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990)." "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.1974)). In this case, the undersigned **FINDS** that the ALJ's RFC determination complies with the law and is

supported by substantial evidence.

### B. Claimant's Non-Severe Impairments

Next, Claimant very briefly argues that the ALJ failed to consider her non-severe impairments in assessing her RFC, including her carpal tunnel syndrome, right shoulder rotator cuff tear, Reiter's syndrome, uveitis, degenerative disc disease, endometriosis, anxiety, depression, and ADD. (ECF Nos. 12 at 10, 14 at 3). The undersigned finds this challenge to be equally without merit.

Certainly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for

the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Here, the ALJ fulfilled his obligation to evaluate Claimant's impairments, separately and in combination. The ALJ expressly recognized that in making the RFC finding, he was obligated to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. at 17) (citations omitted). The ALJ thoroughly evaluated the above-specified impairments at step two of the analysis, discussing how they affected Claimant functionally, and ultimately determined that such conditions were non-severe. *See, e.g., Smith v. Colvin*, No. 2:14-CV-00084, 2015 WL 6082328, at *16 (N.D. W. Va. Sept. 24, 2015), *report and recommendation adopted sub nom. Smith v. Comm'r of Soc. Sec.*, No. 2:14-CV-84, 2015 WL 6126835 (N.D. W. Va. Oct. 16, 2015) ("When reviewing an ALJ's decision, a court must read the 'decision as a whole ... [to evaluate whether the ALJ] consider[ed] the various complaints and limitations [the claimant] reported.' For example, if an 'ALJ does not specifically discuss [a claimant's impairment or the limitations caused by that impairment] within the RFC assessment section of her decision' but instead discussed them 'previously in [step two of] her decision' then the ALJ will be deemed to have considered the impairment and its limitations.) (citations omitted).

The ALJ noted, *inter alia*, that there was no clinical correlation or treatment in the record for Claimant's carpal tunnel syndrome, that Claimant had no current treatment for her prior rotator cuff tear, that Claimant testified and records showed that her uveitis and Reiter's syndrome were controlled with medication, and that

testing showed normal endometrium and pap smear results. (Tr. at 18-19). The ALJ also thoroughly analyzed Claimant's mental impairments, noting, *inter alia*, that Claimant never received medication specifically for ADD; that her attention, concentration, and memory were normal in April 2010; and that despite her reported symptoms, she had specified normal results in mental status and psychiatric examinations. (Tr. at 19-20). The ALJ also analyzed Claimant's mental impairments under the four broad functional areas known as "paragraph B" criteria. (Tr. at 20).

To the extent that the ALJ did not reiterate his above findings or elaborate further on the analysis of Claimant's impairments in combination specifically within the RFC discussion, the undersigned finds this to be unnecessary, or at worst, harmless error.[4] Not only does the decision as a whole make clear that the ALJ considered Claimant's non-severe impairments in rendering his decision, but his questioning of the vocational expert during the administrative hearing made clear that the ALJ unequivocally considered the combination of Claimant's impairments.

During the administrative hearing, the ALJ posed several hypothetical questions, each of which built upon the last by adding to the combination of

---

[4] Courts have applied a harmless error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

impairments. He first asked the vocational expert if a hypothetical individual with Claimant's past work history, education, and age, could perform Claimant's past work if the person was capable of performing medium work as defined in the regulations with certain specified postural and environmental limitations. (Tr. at 71). The ALJ then added a restriction of frequent reaching, handling, and fingering and the expert responded that the person could still work. (Tr. at 72.). After questioning the expert about the impact of additional environmental restrictions, the ALJ inquired if the hypothetical individual could work if additionally limited to simple, routine work with no production rate or pace and occasional contact with the public, coworkers, and supervisors. (Tr. at 73-74). Finally, the ALJ asked if a person could work with the added limitation of missing work two or more days per month and requiring excessive bathroom breaks numbering five to seven times per day due to a combination of her medical conditions, associated pain, mental impairments, and treatment. (Tr. at 77).

While the ALJ ultimately determined that the evidence did not support the above combination of impairments in this case, the decision as a whole and the administrative hearing transcript make clear that the ALJ considered all of impairments alone, and in combination, in rendering his decision in this case. Therefore, the undersigned **FINDS** that the ALJ complied with his duty under the applicable law to consider Claimant's impairments in combination.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to

affirm the decision of the Commissioner, (ECF No. 13); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** March 6, 2017

Cheryl A. Eifert
United States Magistrate Judge